54 F.3d 785
NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
 AMERICAN MEDICAL INTERNATIONAL, INC., Plaintiff-Appellee,
v.
NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA.,
Defendant-Appellant.
 No. 93-56382.
 United States Court of Appeals, Ninth Circuit.
 Submitted March 7, 1995.
Decided May 17, 1995.
 
 1
 Before: SCHROEDER and KLEINFELD, Circuit Judges, and KING,* District Judge.
 
 
 2
 MEMORANDUM**
 
 
 3
 Defendant National Union Fire Insurance Company of Pittsburgh, Pa. ("NU") appeals a $12 million jury verdict for American Medical International, Inc. ("AMI") in AMI's action for breach of an insurance contract and for breach of the implied covenant of good faith and fair dealing. NU contends: (1) that the jury verdict is not supported by substantial evidence and is inconsistent with California law; (2) that the district court erred by refusing to either give the jury NU's proposed coverage instructions or by granting NU judgment as a matter of law on the issue of coverage; (3) that the district court erred by refusing to give the jury NU's proposed instruction on the elements of the tort of bad faith; (4) that the jury's findings and AMI suffered no breach of contract damages but $11 million in bad faith damages are inconsistent and contrary to the district court's instructions; and (5) that the jury's award of $1 million in attorneys' fees was contrary to California law and the district court's instructions. We have jurisdiction pursuant to 28 U.S.C. Sec. 1291 and affirm.
 
 I.
 
 4
 AMI, which owns and operates hospitals and research facilities, in 1988 purchased two insurance policies to reimburse AMI should it have to indemnify its directors and officers for claims made against them in their corporate capacities. The first directors and officers ("D&O") policy was issued by Harbor Insurance Company ("Harbor") and included a policy limit of $10 million. The second policy, with limits of $5 million excess of $10 million, was issued by NU. The NU policy specifically listed AMI as a named insured.
 
 
 5
 In 1988, several competing bidders offered to buy AMI. The AMI board formed a special committee, chaired by director Harold Williams ("Williams"), to review the competing bids. The committee conducted an "auction," with three competing groups submitting proposals to acquire AMI. One of the unsuccessful bidders was an investment group headed by Lee Pearce ("Pearce"), a member of the AMI board of directors. The winning bidder was a group headed by First Boston Bank and the Pritzker Interest Group.
 
 
 6
 In March and early April of 1989, five class action lawsuits were filed on behalf of AMI shareholders and one class action was filed on behalf of AMI bondholders against AMI and its then current and former directors, including Williams and Pearce, alleging they had breached their fiduciary duty by accepting the First Boston/Pritzker bid. Pearce cross-complained against Williams and AMI, alleging they had improperly rejected his bid to purchase AMI. AMI notified both Harbor and NU of the litigation, including the Pearce cross-complaint.
 
 
 7
 In May 1991, AMI advised NU that Harbor had authorized payment of its $10 million policy limit to settle the shareholder actions. AMI asked NU to likewise make its $5 million policy limit available for settlement, but NU refused.[1] Williams' counsel thereafter sought authority from NU to use its policy limit to settle the Pearce claims against Williams, noting that Pearce had offered to settle the claims for $5 million. According to NU, its counsel proposed to fund a cash settlement of Pearce's claims against Williams, while reserving its right to seek reimbursement if a court subsequently held that there was no coverage. According to NU, Williams' counsel refused to consent to a cash settlement if NU reserved its right to seek reimbursement.
 
 
 8
 About three weeks into the trial of the Pearce action, NU's counsel approached Pearce's counsel and proposed a "guarantee" arrangement, labeled by AMI as a "Mary Carter" agreement.[2] Under the terms of the agreement, NU agreed, in exchange for Williams' dismissal from the action, to pay Pearce its $5 million policy limit, less defense costs, in the event Pearce did not recover at least that amount from AMI. The amount guaranteed by NU was to be reduced, dollar for dollar, by the amount Pearce recovered from AMI. Thus if Pearce recovered at least $5 million from AMI, NU would pay nothing. NU included a veto provision in the agreement, pursuant to which Pearce could not settle with AMI for less than $4 million without NU's consent. If Pearce settled with AMI for less than $4 million, he would forfeit the $5 million guarantee.
 
 
 9
 With Williams out pursuant to the guarantee agreement, AMI was the sole remaining defendant in the Pearce litigation. Two weeks into jury deliberations, AMI settled with Pearce for $16 million. AMI paid the entire amount of the settlement.
 
 II.
 
 10
 NU contends, in effect, that the jury's conclusion that NU breached the covenant of good faith and fair dealing through use of the guarantee agreement is not supported by either substantial evidence or applicable legal precedent.
 
 
 11
 NU first argues that under the D&O policy it owed no duty to AMI until AMI actually indemnified Williams, because the policy did not insure the corporation for its own liability, but only provided for the reimbursement of amounts paid by the corporation to indemnify an insured director or officer. Nu contends that by obtaining Williams' dismissal pursuant to the guarantee agreement, it provided both Williams and AMI with the full protection to which they were entitled under the policy, i.e., Williams was relieved of the risk of personal liability and AMI was relieved of any risk that it might have to indemnify Williams for his liability to Pearce. AMI, of course, rejects NU's contention that it owed AMI no duty. AMI notes that it was a named insured under the D&O policy and paid the policy premiums. As such, AMI argues it was owed a duty of good faith and fair dealing by the insurer, independent of NU's duty to Williams and the other directors.
 
 
 12
 In support of the jury's conclusion that NU's conduct constituted a breach of the covenant of good faith and fair dealing, AMI notes this court's opinion in Matison v. Transamerica Title Ins. Co., 845 F.2d 867 (9th Cir. 1988). In Matison, the insured under a title insurance policy was sued in a quiet title action involving both covered and noncovered claims, the latter alleging fraud and a breach of fiduciary duty. The insurer settled the covered claims with the plaintiff for $80,000, on the condition, however, that the plaintiff vigorously pursue the remaining noncovered claims and not settle them for less than $80,000. Any monies collected by the plaintiff from the insured would reduce the amount payable by the insurer. If the plaintiff recovered $80,000 or more from the insured, the insurer would pay nothing.
 
 
 13
 The insured sued the insurer for breach of contract and bad faith, and the district court entered judgment for the insurer, holding that the insurer had discharged its duty to defend title to the property by settling the quiet title action. The district court further found that the insurer's partial settlement "did not impair any duty under its contract with the insured." This court, applying Arizona law, disagreed, concluding that the insurer "had a duty of 'a fiduciary nature' not to benefit at the expense of its insured." Id. at 868 (citing Rawlings v. Apodaca, 726 P.2d 565, 571 (Ariz. 1986)[3]). This court noted that such a duty could be breached even where an insurer had performed all of its express contractual undertakings.[4]
 
 
 14
 NU contends that Matison is inapplicable to the instant-case because it did not involve a D&O policy, which insures the liability of a corporation's directors and officers--not the corporation itself. NU argues that because it had no personal exposure in the underlying action, it did not advance its own interests at the expense of its insured, i.e., Williams. Additionally, NU notes that it obtained a dismissal of all the claims against its insured, both covered and uncovered.
 
 
 15
 NU's argument ignores the fact that AMI was also its insured. The fact that AMI might be entitled to the policy proceeds only if it were forced to indemnify Williams would not relieve NU of its duty not to benefit at the expense of AMI. NU's guarantee agreement with Pearce had essentially the same effect as Transamerica's agreement with the plaintiff in Matison, i.e., to encourage the plaintiff to pursue its possibly uncovered claims against an insured in the hopes of reducing or eliminating the insurer's liability. The jury apparently concluded on the basis of the evidence of the guarantee agreement that NU had engaged in a scheme to benefit at the expense of its insured, and thus breached the covenant of good faith and fair dealing. This factual finding was based on substantial evidence in the record.
 
 
 16
 NU raises various coverage defenses based on language in its policy and in the primary policy issued by Harbor. Even assuming, without deciding, however, that NU had a valid coverage defense, AMI would not be excused under this court's reasoning in Matison, from liability for the breach of its duty not to benefit at the expense of its insured. Thus the validity of NU's coverage defenses is not controlling.
 
 III.
 
 17
 NU also contends the district court erred in rejecting its proposed coverage instructions, which would have had the court tell the jury that (1) NU's obligations under its policy were not triggered because the Harbor policy had not been exhausted, and (2) that the Harbor and National Union policies did not cover claims based on a director's conduct in preventing the acquisition of a corporation. AMI contends that NU withdrew the disputed instructions before a ruling by the district court, thus precluding NU from raising the matter on appeal. See Fed. R. Civ. P. 51; see also Lifshitz v. Walter Drake & Sons, Inc., 806 F.2d 1426, 1431 (9th Cir. 1986).
 
 
 18
 Even assuming the instructions were not withdrawn, however, the district court's refusal to give them has little bearing on this appeal. As already noted, an insurer may be liable for breach of the covenant of good faith and fair dealing even in the absence of any breach of the express provisions of the insurance contract. If NU wanted to dispute coverage it could and should have filed an action for declaratory relief. Instead, it chose to involve itself in the underlying litigation in a way that the jury in the instant bad faith action apparently found to be both self-serving and prejudicial to the interests of NU's insured. This court finds no error in the district court's refusal to give the instructions proffered by NU.
 
 
 19
 NU further contends that because the district court declined to give the coverage instructions proffered by NU, it should have granted NU's motions for a directed verdict on coverage, because interpretation of the insurance policy was a question of law for the court, not one of fact to be argued by counsel and decided by the jury. The above discussion of the relevance of the coverage issue to the question of bad faith applies with equal force to the motions for directed verdict. This court finds no error in the district court's denial of the motions.
 
 IV.
 
 20
 NU also contends the district court erred in not giving the following instruction on the necessary elements of a tort action for bad faith:
 
 
 21
 (1) the contract must be such that the parties are in inherently unequal bargaining positions; (2) the motivation for entering the contract must be a nonprofit motivation, i.e., to secure peace of mind, security, future protection; (3) ordinary contract damages are not adequate because (a) they do not require the party in the superior position to account for its actions, and (b) they do not make the inferior party 'whole'; (4) one party is especially vulnerable because of the type of harm it may suffer and of necessity places trust in the other party to perform; and (5) the other party is aware of this vulnerability.
 
 
 22
 The instruction was drawn from Wallis v. Superior Court, 207 Cal.Rptr. 123, 129 (Cal.Ct.App. 1984), a case in which an employee alleged a bad faith breach of an employment contract. The district court rejected the instruction as inapplicable in the context of a suit for insurance bad faith. California courts have held that every contract of insurance gives rise to a duty of good faith and fair dealing, the breach of which is a tort. Downey Sav. & Loan Ass'n v. Ohio Cas. Ins. Co., 234 Cal.Rptr. 835 (Cal.Ct.App. 1987), cert.denied, 486 U.S. 1036 (1988). Under California law, the size or sophistication of an insured does not affect the insurer's duty of good faith. See, e.g., Commercial Union Assur. Cos. v. Safeway Stores, Inc., 610 P.2d 1038 (Cal. 1980); Twentieth Century-Fox Film Corp. v. Harbor Ins. Co., 149 Cal.Rptr. 313 (Cal.Ct.App. 1978).
 
 
 23
 NU's reliance on this court's opinion in Slottow v. American Cas. Co., 10 F.3d 1355 (9th Cir. 1993) is misplaced. The portion of Slottow cited by NU refers only to the appropriate standard for an award of punitive damages under California law--not for breach of the implied covenant of good faith and fair dealing.
 
 
 24
 NU's proffered instruction on bad faith does not comport with California insurance law. Accordingly, the district court did not err in refusing to give the instruction.
 
 V.
 
 25
 NU contends that the jury's award of no breach of contract damages and $11 million in bad faith damages "cannot be harmonized rationally, [and thus] the judgment must be vacated and a new trial ordered," citing Brooks v. Brattleboro Memorial Hosp., 958 F.2d 525, 529 (2d Cir. 1992); Weingart v. Allen & O'Hara, Inc., 654 F.2d 1096, 1105-06 (5th Cir. 1981).
 
 
 26
 In this circuit, however, a court reviewing a jury's special verdict responses for consistency "has a duty to reconcile the jury's special verdict responses on any reasonable theory consistent with the evidence." Ortiz v. Bank of America NT & SA, 852 F.2d 383, 388 (9th Cir. 1987). Moreover, "[t]he consistency of the jury verdicts must be considered in light of the judge's instructions to the jury." Toner v. Lederle Lab., 828 F.2d 510, 512 (9th Cir. 1987), cert. denied, 485 U.S. 942 (1988).
 
 
 27
 AMI offers what it contends is a reasonable interpretation of the jury's response on the Special Verdict Form that AMI suffered $0 in breach of contract damages: The jury did find that AMI was damaged by the contract breach in the amount of the $5 million limit of the NU policy and that AMI's bad faith damages were $11 million--the combined total reflecting the $16 million settlement between AMI and Pearce. However, the jury believed it was precluded by Instruction No. 37 from awarding both contract and bad faith damages. Instruction No. 37 provided, in pertinent part, that the jury could not "award compensatory damages more than once for the same injury."
 
 
 28
 The jury's verdict in the instant case is also consistent with this court's holding in Matison, and the analysis acknowledged by the California court in McMillin, that an insured may recover for bad faith in the absence of a breach of express contract provisions.
 
 
 29
 The verdict thus may be reconciled on the basis of at least one reasonable theory consistent with the evidence. Accordingly, this court will not vacate the jury award and order a new trial.
 
 VI.
 
 30
 In an insurance bad faith action under California law, an insured may recover only those attorneys' fees attributable to the efforts of the insured's attorneys to recover the benefits due under an insurance contract. Brandt v. Superior Court, 693 P.2d 796, 800 (Cal. 1985). Fees attributable to obtaining any part of the plaintiff's award that exceeds the amount due under the policy are not recoverable. Id.
 
 
 31
 NU argues that Brandt's holding precludes an award of attorneys' fees where, as in the instant case, the insured does not obtain an award of contract damages. Brandt, however, does not expressly hold as such, but rather speaks of fees attributable to an insured's "efforts" to obtain policy benefits. NU cites no other authority precluding an award of attorneys' fees where a jury fails to award contract damages but awards bad faith damages.
 
 
 32
 NU also argues that the AMI failed to segregate those fees attributable to pursuit of its claim for policy benefits from the fees attributable to its bad faith claim. AMI, however, notes that its fee witness testified at trial that AMI spent $1,069,000.00 to "secure the benefits under the National Union policy." His testimony was not contradicted.
 
 
 33
 AMI also notes the court's instruction to the jury on the question of fees:
 
 
 34
 If an insurance company breaches its duty of good faith and fair dealing under the insurance policy, then an insured is entitled to recover as damages the reasonable attorneys' fees incurred in seeking to recover the contract benefits of the policy, but not any of the attorneys' fees incurred in seeking the recovery of bad faith damages.
 
 
 35
 The instruction comports in its essential terms with the model instruction recommended by the California Supreme Court in Brandt. See Brandt, 693 P.2d at 800. Moreover, the jury's determination of fees is supported by substantial evidence in the record. Accordingly, the jury's award of attorneys' fees will stand.
 
 VII.
 
 36
 We AFFIRM the judgment of the district court.
 
 
 
 *
 Honorable Samuel P. King, Senior United States District Judge for the District of Hawaii, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [1]
 The shareholder actions were subsequently settled, and the bondholder action was dismissed
 
 
 [2]
 A "Mary Carter" agreement is an arrangement between a plaintiff and a defendant whereby the exposure to liability of the settling defendant is limited, "usually in some inverse ratio to the amount of recovery which the plaintiff is able to make against the nonsettling defendant or defendants." Black's Law Dictionary 974 (6th ed. 1990). The term comes from the case of Booth v. Mary Carter Paint Co., 202 So.2d 8 (Fla.App. 1967)
 
 
 [3]
 The insurer in Rawlings concealed the results of a fire investigation from its insured, who had received the $10,000 policy limit under his property policy for the destruction of his barn, because the report showed the insured's neighbor caused the fire, and the neighbor had a $100,000 liability policy with the same insurer
 
 
 [4]
 California courts have acknowledged, albeit in dicta, that there may be circumstances under which an insurer could be liable to its insured for tortious bad faith even where the insurer has not violated an express provision in its policy. See McMillin Scripps North Partnership v. Royal Ins. Co. of America, 23 Cal.Rptr.2d 243, 247 (Cal. Ct.App. 1993) (citing Rawlings). Thus, NU's argument that it did not withhold any policy benefits from AMI, even if true, would not preclude AMI's maintenance of an action for bad faith